**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES GUIRLANDO** | ) | |
| Plaintiff, | ) ) | Case No. 14 C 4811 |
| v. | ) ) | |
| **CAROLYN COLVIN** Commissioner of Social Security, | ) ) ) | Magistrate Judge Daniel G. Martin |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Guirlando ("Plaintiff" or "Guirlando") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for disability benefits and supplemental security income under Title II and Title XVI of the Social Security Act in a November 29, 2012 written decision of Administrative Law Judge ("ALJ") Robert Karmgard. Guirlando appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision.

The Court does not discuss the record in detail: the medical evidence is sparse; Guirlando has aptly summarized it in his motion; and the ALJ's decision is clearly erroneous. In brief, Plaintiff suffers from joint and disc disease in both hips, knees, and the lumbar spine. He was treated sporadically at the Crusader Community Clinic in Rockford, Illinois by Dr. Adekola Ashaye and a physician's assistant. Guirlando was unable to see an orthopedic surgeon or obtain specialized imaging for his condition because he lacked health insurance. Instead, he was treated with a variety of pain medications for his hip,

knee, and spine pain. Dr. K. P. Ramchandani conducted a consultative exam on Plaintiff on May 12, 2011. An administrative hearing was held in September 2012, at which family practice specialist Dr. Guilberto Munoz testified. After the hearing, orthopedist Dr. Leighton Johnson carried out the first (and only) orthopedic exam of Plaintiff's severe joint disorders.

Following the familiar five-step analytic procedure, ALJ Karmgard found at Step 1 that Guirlando had not engaged in substantial gainful activity since his alleged onset date of October 21, 2010. Plaintiff's severe impairments at Step 2 included bilateral degenerative disease of the hips and knees, degenerative disease of the lumbar spine, and hypertension. None of these impairments met or equaled a listing at Step 3, either singly or in combination. Before moving to Step 4, the ALJ found that Plaintiff's testimony on the severity of his symptoms was not credible insofar as it was inconsistent with the RFC. The RFC itself was assessed as sedentary work with a range of exertional and non-exertional restrictions. The ALJ declined to give controlling weight to the written report of orthopedist Dr. Johnson. However, "great" weight was assigned to two non-examining state-agency experts and Dr. Munoz. The ALJ then found at Step 4 that Guirlando could not carry out his former work. Relying on the testimony of a vocational expert ("VE"), ALJ Karmgard determined that jobs existed in the national economy that Plaintiff could perform. He thus concluded that Guirlando was not disabled.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by

2

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can

3

perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Discussion

Plaintiff claims that the ALJ erred: (1) at Step 3; (2) in assessing his credibility; (3) in assigning weight to the medical experts; (4) in considering obesity; and (5) at Step 5. Given the plain errors in the ALJ's decision noted below, the Court does not address the Step 5 issue. With the exception of the Step 3 matter, Plaintiff's remaining claims are discussed in order.

### A. Credibility

Near the end of his decision, ALJ Karmgard concluded that Plaintiff's statements concerning the frequency and severity of his symptoms were not credible. The ALJ supported this finding by claiming that Plaintiff's allegations were inconsistent with, or unsupported by: (1) the fact that Guirlando had engaged in some work activities; (2) what the ALJ construed as conservative treatment inconsistent with a claim of disability; (3) the record concerning pain; and, (4) Plaintiff's activities of daily living ("ADLs"). The Court agrees with Plaintiff that none of these reasons provide substantial evidence for the credibility assessment.

The ALJ's reliance on Plaintiff's work history was misplaced. He cited a number of part-time jobs that Plaintiff worked at in 2009 through 2011. It is not clear the degree to which the ALJ relied on Guirlando's work in 2009 and 2010 that preceded his alleged onset date of October 21, 2010. Insofar as the ALJ considered these pre-disability jobs, he failed to explain why they were relevant to Plaintiff's disability period. As for his post-October 2010 jobs, Plaintiff worked between 15 and 20 hours a week at Popeye's Chicken from January 2011 through July 2011. (R. 85). The ALJ noted that Plaintiff worked four-hour

5

shifts, lifted up to 40 pounds until he eventually became unable to do so, and "was on his feet almost all the time." (R. 85).

This fails to show why Guirlando was not credible. It is well-established that a claimant cannot be deemed to be non-disabled merely because he works. That is the case even when the claimant works full time, which Guirlando did not. *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013) ("One can be employed full time without being capable of substantial gainful activity, paradox though that may seem.") (citing cases); *see also Jones v. Shalala*, 21 F.3d 191, 192 (7th Cir. 1994). A more nuanced analysis is required before an ALJ can rely on a claimant's work as evidence that he is not credible. ALJ Karmgard did not provide that here. The problem is exacerbated in this case because he also relied on erroneous assumptions about Plaintiff's work. He said that Plaintiff stood most of the time at his part-time job. But Guirlando actually told the ALJ that he "always leaned against counters" and that he "couldn't stand on my feet for four hours straight." (R. 25). The ALJ never discussed why Plaintiff's part-time work that involved exertional and non-exertional limits meant that he could work eight hours a day, five days a week.

ALJ Karmgard's reliance on Plaintiff's "conservative" treatment history was also erroneous. He criticized Plaintiff for seeking out medical treatment that one would not expect from a claimant who is truly disabled. It is true that Plaintiff did not consult a specialist or undergo aggressive treatment. However, the record clarifies why that was the case – Guirlando lacked medical insurance. The ALJ noted that fact in his decision. That makes it even more puzzling why he thought that Guirlando should, or even could, have sought out more aggressive treatment if his limitations were as serious as Plaintiff claimed. Merely noting that Guirlando did not have insurance was insufficient. *See Hill v. Colvin*,

— F.3d —, 2015 WL 7785561, at *5 (7th Cir. Dec. 3, 2015) ("How [Guirlando] could have paid for a specialist, the ALJ did not say.").

The ALJ overlooked critical evidence on the issue. Guirlando asked his treaters at the Crusader Clinic to refer him to an arthritis specialist; they were unable to do so because he lacked insurance. (R. 399). Plaintiff was also unable to afford an MRI to assess the severity of his joint problems. (R. 395). When he finally did see orthopedic surgeon Dr. Johnson in 2012, the specialist recommended a bi-lateral hip replacement for what he characterized as "advanced end-stage osteoarthritis of both hips." (R. 473). The ALJ took note of Dr. Johnson's conclusions. However, he does not appear to have grasped that when Plaintiff finally saw the kind of specialist he could not afford earlier, the doctor issued findings that were fully consistent with Plaintiff's allegation that he suffered from severe hip pain. That supports rather than undermines Guirlando's credibility.

The ALJ lacked any ground for criticizing Plaintiff about his treatment without accounting for the full implications of Plaintiff's lack of medical insurance, or his inability to obtain more aggressive treatment. ALJ Karmgard neither discussed these issues nor asked Guirlando at the hearing how his lack of medical insurance placed restrictions on the care he received. That was erroneous. An ALJ is always required to approach such issues with caution. *See* SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide."). ALJ Karmgard was obligated to explain why, given that Plaintiff lacked insurance, the treatment that he received at Crusader Clinic was inconsistent with his alleged disability.

The ALJ also thought that Plaintiff's pain testimony was not fully credible. His reasons for that conclusion are seriously flawed. The pain issue posed special burdens on the ALJ in this case because (1) the ALJ himself acknowledged that Plaintiff's doctors stated that his pain complaints were legitimate and, (2) medical expert Dr. Munoz testified that Plaintiff's pain level could not be measured by tests or the severity of his arthritic condition. (R. 50, "He, he is the only one who knows how much pain he has."). The ALJ noted some parts of the record that confirm Plaintiff's allegations without explaining why he thought they undermined Guirlando's credibility. A March 2012 note states that Plaintiff was experiencing "legitimate pain" and needed to be re-referred to specialized pain management. (R. 455). And of course, Dr. Johnson – the only orthopedic specialist to examine Plaintiff – thought that Guirlando needed a double hip replacement for "severe groin and thigh pain." (R. 473).

The ALJ also overlooked important parts of the record. He thought that Guirlando's pain treatment had "been generally successful in controlling" his symptoms. In support, he cited an October 2009 treatment note stating that Plaintiff's knee and hip pain was "all better." But the 2009 note was irrelevant to the issue. Plaintiff claims that he became disabled in October 2010, one year later than the October 2009 note that the ALJ cited. The ALJ never explained why a pre-disability note illuminated Plaintiff's post-onset condition. He further tried to support his reasoning by citing an October 2010 entry stating that Plaintiff had an "unremarkable" physical exam, and that his medication controlled his pain. Unfortunately, the ALJ did not recognize that an October 20, 2010 note also stated that Plaintiff's pain medications "are no longer keeping his pain under control." (R. 399). A November 2011 note states that Plaintiff was suffering from increased pain and required

additional doses of pain medication. (R. 457-58). The ALJ's failure to cite the relevant evidence that was counter to his conclusion is tantamount to forbidden "cherry picking" of evidence. *See Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) (stating that an ALJ must consider all relevant lines of evidence and may not "select and discuss only that evidence that favors his ultimate conclusion").

The Commissioner claims in broad terms that the ALJ properly relied on Guirlando's ADLs to discount his credibility. An ALJ is entitled to cite a claimant's ADLs as part of a credibility analysis. SSR 96-7p. Under these facts, however, ALJ Karmgard failed to explain anything meaningful about Plaintiff's ability to work. Guirlando said that he could cook simple meals while seated at his kitchen table. (R. 28). The ALJ never asked Plaintiff to describe what this involved. His written statements of daily activities describe this activity as ranging from two minutes to an hour in work. (R. 253). Even if the ALJ had noted this set of written comments (which he did not), further explanation would have been required to support his conclusion. Common sense suggests that a claimant who can only take two minutes to prepare a meal cannot be deemed able to work based on that limited activity. Cooking for an hour may imply otherwise. However, Plaintiff's ADL statement was made in August 2009, over a year *before* his disability onset of October 2010. The ALJ did not inquire about what Plaintiff's post-onset cooking activities involved. Thus he had no ground for relying on those activities to undermine Guirlando' credibility.

The ALJ further relied on the fact that Plaintiff said that he could clean with a feather duster. That lacks all merit. Even if using a feather duster could be construed as relevant to working full time – an inference this Court fails to grasp – the ALJ overlooked that Plaintiff told him that he only cleaned for a "couple of minutes at a time." (R. 28). That is

9

hardly evidence that Plaintiff can work five days a week.

The ALJ also thought that Guirlando could work because he testified that he could go fishing. Citing *Scott v. Sullivan*, 898 F.2d 519 (7th Cir. 1990), the Commissioner argues that is sufficient to support a finding that Plaintiff can carry out sedentary work. The Court disagrees. The claimant in *Scott* stated that he could do far more than Guirlando testified to in this case. He could go "hunting and fishing," *id*. at 524 n.6, as well as help with household chores, mow the lawn, and ride a bike. *Id*. at 521. By contrast, Guirlando said he could not vacuum, could only shop once every two weeks, and had significant difficulty getting in or out of the shower. (R. 28-30). As for fishing itself, he must be dropped off "right at the water," cannot get in a boat, and "can't hike to any of the good spots I used to anymore." (R. 29). The ALJ provided no explanation as to why this limited range of activities undermined Plaintiff's credibility.

Combined with the other oversights concerning Plaintiff's daily activities and the medical record, the ALJ's discussion failed to draw a logical bridge between the record and his conclusion concerning credibility. The Seventh Circuit has warned adjudicators that "[t]he critical differences between [ADLs] and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons [here, Plaintiff's girlfriend], and is not held to a minimum standard of performance, as [he] would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). At a minimum the ALJ was required to discuss these issues more fully and explain why they meant that Plaintiff could carry out sedentary work on a full-time basis. For all these reasons, Plaintiff's motion is granted on this issue.

## B. The Medical Experts

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).

In this case, the ALJ assigned "great" weight to the testifying medical examiner Dr. Munoz and two non-examining state agency experts, Dr. Towfig Arhmand and Dr. George Andrews. He further concluded that the examining orthopedist Dr. Johnson was not entitled to controlling weight. Substantial evidence does not support any of these findings.

The ALJ's assessment of the non-examining state agency physicians is self-contradictory. Dr. Arhmand concluded in September 2009 – before the amended onset date of October 2010 – that Guirlando could perform light work. (R. 381-88). Dr. Andrews stated in May 2011 that he could do less than light work. (R. 431-38). The ALJ disagreed with both experts by finding that Plaintiff could only carry out sedentary work. This means that the ALJ thought that Guirlando was more restricted than either Dr. Arhmand (whose assessment does not even address Plaintiff's alleged disability period) and Dr. Andrews believed. The ALJ could not logically assign great weight to the non-examining state agency doctors and, at the same time, reject their basic findings.

The ALJ also failed to explain adequately why he assigned the weights he gave to Dr. Munoz or Dr. Johnson. In fact, he never said what weight was given to Dr. Johnson at all. That was erroneous in itself. *David v. Barnhart*, 446 F. Supp.2d 860, 871 (N.D. Ill. 2006) ("The weight given to a treating [or examining] physician cannot be implied[.]"). ALJ Karmgard only stated that Dr. Johnson was not entitled to controlling weight because he saw Plaintiff once. The Court agrees with that limited claim. But it does not mean that the ALJ could stop at that point and fail to state what weight Dr. Johnson deserved. He was obligated to go farther and explain why Dr. Munoz deserved more weight than Dr. Johnson. Doing so would have required the ALJ to address several key issues that he overlooked. Unlike Dr. Johnson, Dr. Munoz never examined Plaintiff. The regulations advise ALJs that they are required to "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not." 20 C.F.R. § 404.1527(d)(1). An ALJ may choose to favor a non-examining source over an examining one if he provides a reasoned explanation that is supported by the record. ALJ Karmgard did not do so.

The regulations also require an ALJ to consider a medical expert's expertise when assigning weight. 20 C.F.R. § 404.1527(d)(5). Dr. Munoz was a family practitioner. Dr. Johnson was an orthopedic surgeon expertly trained in assessing Plaintiff's severe joint disease. The ALJ seems to have been unaware that this posed a problem in his analysis. He also appears not to have understood that he was required to explain why Dr. Munoz could be given great weight when he did not review the entire medical record. Dr. Johnson's examining report was not available at the time of the hearing. The report cited serious limitations. It showed that Plaintiff had a "very poor range of motion in both hips" and suffered from end-stage arthritis that required a bilateral hip replacement. His gait was

abnormal, and he had difficulty in getting up from a sitting position. (R. 467). Internal and external rotation showed "severe pain." (R. 473). Dr. Johnson thought that Plaintiff could sit for 10 minutes at a time, and sit for a total of about two hours each day. He could stand for five minutes at a time, for a total of less than two hours a day. Plaintiff would need unscheduled breaks throughout a normal work day and would need to rest at least five to 10 minutes at a time before returning to work.[1] (R. 475).

The Commissioner argues that the ALJ had reason to discount Dr. Johnson's report because, contrary to the expert's serious limitation on sitting (only 10 minutes at a time), Plaintiff was able to sit through the administrative hearing. The Court agrees with the government on this point. Guirlando did sit far longer than Dr. Johnson said he could. That said, it does not provide a sufficient ground for rejecting everything that Dr. Johnson assessed. The orthopedist made several crucial findings. He thought that Plaintiff needed a sit/stand option; required six breaks a day for five to 10 minutes each; and would need to use a cane for standing and walking.[2] (R. 475). Rejecting Dr. Johnson's assessment of Plaintiff's ability to sit does not necessarily imply that the ALJ was justified in setting

---

[1] The ALJ erroneously construed Dr. Johnson's report to mean that Plaintiff could still sit "with normal breaks, at 2 hour intervals," as set out in the RFC. (R. 89). Dr. Johnson said that Plaintiff could only sit for a total of two hours during an eight-hour day. (R. 475). The ALJ concluded that he could sit for up to six hours each day. Because the ALJ's weighing of Dr. Munoz's and Dr. Johnson's opinions requires reconsideration, the ALJ must also reconsider his RFC assessment. He is not entitled to rely on Dr. Munoz's testimony without first properly assessing the weight to be given to the medical experts and properly analyzing Plaintiff's credibility.

[2] The last finding undermines the ALJ's repeated citation of the fact that no doctor had prescribed the cane that Plaintiff said he needed, and which several treating sources noted that he used. Clearly, Dr. Johnson thought the cane was necessary after he examined Plaintiff. The ALJ is directed to account for that in his reconsideration of the record.

aside everything else the orthopedist cited. An expert report does not have to be adopted or rejected as a whole. It can be given weight on some findings even though others are rejected. *See McMurtry v. Astrue*, 749 F. Supp.2d 875, 888 (E.D. Wis. 2010). Given that Dr. Johnson examined Plaintiff and had orthopedic expertise that Dr. Munoz lacked, the ALJ could not rely on Plaintiff's capacity to sit through the hearing to reject all of Dr. Johnson's findings, at least without explaining the basis of his reasoning more fully.

The ALJ tried to discount Dr. Johnson's report based on Plaintiff's ADLs, including his use of the feather duster. The shortcomings of that analysis are discussed above. The ALJ also relied on the fact that examining physician Dr. K. P. Ramchandani had stated earlier that Plaintiff could get on and off the examining table without difficulty. (R. 426). The ALJ never explained why that limited observation was relevant to the issue. Even if it was, the ALJ was obligated to note that Dr. Ramchandani's exam took place in May 2011, 17 months prior to Dr. Johnson's exam in October 2012. The gap was important in this case because Plaintiff explained that his condition had grown worse over time. The ALJ should have been aware that when he said that Plaintiff suffered from "degenerative" joint disease, that condition frequently becomes worse over years. Courts have repeated instructed ALJs to account for that medical reality. *See Hill*, — F.3d —, 2015 WL 7785561, at *6 (citing *Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013)).

The record supports that claim. The ALJ cited treatment notes from September and October 2009 stating that Plaintiff had a full range of motion in his hips. (R. 84). However, Dr. Johnson's 2012 exam revealed "very poor range of motion of hips." (R. 472). The ALJ said that Plaintiff stated that his pain was only a "little worse" than it had been before. (R. 23, 85). But Guirlando also said that "it's been steadily getting worse for years," that his

pain was "intense," and that "it makes me scream when I'm walking. People stop and stare at me." (R. 31-32). That is consistent with Dr. Johnson's exam observation that Plaintiff suffered from severe thigh pain, walked with a forward flexion of 20 to 30 degrees, and suffered from "advanced end-stage osteoarthritis of both hips with cyst formation in both femoral heads and acetabuli." (R. 473).

Plaintiff's motion is granted on the medical expert issues. On remand the ALJ shall explain the specific weight given to Dr. Johnson's report. If he decides to give greater weight to Dr. Munoz, the ALJ shall account for the facts that the medical expert did not review the complete record, had less expertise than Dr. Johnson in orthopedic issues, and did not examen Guirlando.

### D.     Obesity

Guirlando also suffers from obesity. The ALJ noted his weight and body mass index, though he never described Plaintiff as obese or found that obesity constituted a severe or non-severe impairment. Plaintiff argues that the ALJ erred by not considering how obesity affected his functioning, and by not considering its effect on the ALJ's five-step analysis. Under SSR 02-1p, obesity can be a medically determinable impairment at Step 2. *Cf. Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). It can also be a factor in the Step 3 assessment, even though the listing for obesity has been removed. Moreover, an ALJ is always required to consider the combined effect of a claimant's impairments, both severe and non-severe. "A failure to fully consider the impact of non-severe impairments requires reversal." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).

The Court agrees that the ALJ failed to properly consider Plaintiff's obesity. He did not explain why it was not a severe or non-severe impairment, did not consider its effects

on Plaintiff's severe joint problems, and never explained how he considered obesity as part of the RFC. Nevertheless, remand is not automatically required unless a claimant submits "evidence explaining how his obesity affected his ability to work or aggravated his other conditions." *Capman v. Colvin*, 617 Fed.Appx. 575, 581 (7th Cir. 2015). Guirlando has not done so here. The Court agrees with the Commissioner that remand would not be necessary if obesity were the only basis for returning this case to the ALJ. Since it already requires remand, however, the ALJ should correct his oversight by explaining how he considered Plaintiff's obesity in the five-step analysis.

### E. Step 3

The ALJ found that Plaintiff's joint impairments did not meet or equal listing 1.02A, which requires a claimant to show a:

> gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s), with involvement of one major peripheral weight-bearing joint (i.e. hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The ALJ's only analysis of this issue stated: "On review of the record, the medical expert opined that no listing provisions, including sections 1.00 et seq. had been met or otherwise equaled." (R. 87). The medical expert, in turn, never identified any specific listing or discussed why Plaintiff did not meet or equal listing 1.02A. He simply answered "no" to the ALJ's general inquiry whether Plaintiff met or equaled "any of the listings relative for either the spine or weight-bearing,

16

joints, any listings here or any hypertension, medical or otherwise . . . at any point since October '10." (R. 45).

The ALJ's generalized statement is tantamount to the kind of perfunctory analysis that the Seventh Circuit has forbidden. *See*, *e.g.*, *Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015). Neither the ALJ nor Dr. Munoz identified any factor required by listing 1.02A. In addition, Dr. Munoz did not have before him Dr. Johnson's expert report and exam conclusions. Dr. Munoz was thus unaware that Plaintiff had a "cyst formation in both the femoral heads and acetabuli" of his hips. (R. 467). The expert did not have an opportunity to decide if that abnormal formation met or equaled the "anatomical deformity" required by listing 1.02A. Guirlando certainly had chronic pain and an abnormal motion of his hips that me the remaining requirements of the listing.

Moreover, neither the ALJ nor Dr. Munoz addressed why Plaintiff did not meet the effective ambulatory requirements of listing 1.00B2b. That provision defines ineffective ambulation "generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Examples include the need to use two crutches or two canes. Guirlando only uses one cane. The ALJ may have thought that prevented Guirlando from meeting the requirements of listing 1.00B2b, assuming for the sake of argument that the ALJ considered the issue at all. He certainly thought that Plaintiff's use of a cane was important. The ALJ returned to that issue more frequently than any other evidentiary item, repeatedly criticizing Plaintiff because no doctor had prescribed it.

This was insufficient on two grounds. First, Dr. Johnson stated in his report that the cane was medically necessary. That eliminates the ALJ's reliance on the fact that no

17

doctor had prescribed it. Second, listing 1.00B2b cites the use of two canes only as an example of ineffective ambulation. Listing 1.00B2a states that ineffective ambulation is "defined generally" as the use of ambulatory device that restricts both upper extremities. Plaintiff points out that the Seventh Circuit has rejected an ALJ's reliance on the fact that a claimant only uses one cane. *Moss v. Astrue*, 555 F.3d 556, 562-63 (7th Cir. 2009). That is especially true when, as here, the ALJ incorrectly assesses a claimant's ability to carry out ADLs, erroneously measures credibility, and fails to properly weigh the medical experts. *See id*. Other courts have also found that the use of one cane does not necessarily preclude a claimant from meeting or equaling the requirements of listing 1.00B2b. *See Dobson v. Astrue*, 267 Fed.Appx. 610, 611 (9th Cir. 2008); *Fleming v. Barnhart*, 284 F. Supp.2d 256, 268 (D. Md. 2003) (noting "if [a claimant] who uses [only] one cane or one crutch is otherwise unable to effectively ambulate, the impairment(s) might still meet or equal a listing") (quoting *Revised Med. Criteria for Determination of Disability, Musculoskeletal System and Related Criteria*, 66 Fed.Reg. 58,010, 58,013 (Nov. 19, 2011)); *Dunham v. Astrue*, 603 F. Supp.2d 13, 18 (D.D.C. 2009).[3]

The Court concludes that the issues related to effective ambulation are fact-intensive and require an ALJ to assess how a claimant functions vis-a-vis the ambulatory examples set out in listing 1.00B2b. *See Dobson*, 267 Fed.Appx. at 611 ("[T]he use of a two-handed assistive device is not necessary to establish ineffective ambulation under this

---

[3] Unfortunately, the Commissioner fails to address this important, and quite vexed, topic. The Court notes that the Seventh Circuit has also stated in an unpublished opinion that two canes are necessary to meet the listing. *Coleman v. Astrue*, 269 Fed.Appx. 596, 602-03 (7th Cir. 2008). Other courts have reached the same conclusion. *See Hornbrook v. Astrue*, 2010 WL 3168141, at *9 (W.D. Pa. July 23, 2010); *Hamilton v. Astrue*, 2010 WL 3748744, at *6-7 (C.D. Calif. Sept. 22, 2010).

Listing."). Given that the ALJ erred in assessing credibility, weighing the experts, did not consider Plaintiff's obesity, and provided little or no explanation of his reasoning, remand is required for reconsideration of the listing issue. Plaintiff's motion is granted on the Step 3 topic.

### III. Conclusion

Plaintiff James Guirlando's Motion for Summary Judgment [14] is granted. The Commissioner's cross-motion [21] is denied. The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

The ALJ is instructed to: (1) adequately discuss the listing issue; (2) reassess Plaintiff's credibility; (3) explain his reasoning for the weights given to each medical expert, including the relative weights assigned to Dr. Munoz and Dr. Johnson; (4) consider the severity and effects of Plaintiff's obesity; and, (5) restate the RFC in light of any revised conclusions that the ALJ may reach.

ENTERED:

_____
DANIEL G. MARTIN
United States Magistrate Judge

Dated: December 18, 2015